IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| **UNITED STATES OF AMERICA,** | 3:12-cr-00513-BR-1 |
| Plaintiff, | FINDINGS OF FACT |
| v. | AND ORDER |
| **MARK ALBERT LYNN,** | |
| Defendant. | |

**S. AMANDA MARSHALL**
United States Attorney
**JOHN C. LAING**
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204
(503) 727-1000

    Attorneys for Plaintiff

**STEVEN T. WAX**
Federal Public Defender
**SUSAN A. RUSSELL**
Assistant Federal Public Defender
101 S.W. Main Street
Suite 1700
Portland, OR 97204
(503) 326-2123

    Attorneys for Defendant

1 - FINDINGS OF FACT AND ORDER

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion (#35) to Suppress Evidence and Statements by which Defendant seeks to suppress, among other things, evidence seized during a search of his vehicle as part of a traffic stop made during a time that Defendant's vehicular movements were monitored pursuant to a state warrant authorizing GPS monitoring in Oregon.

On January 24, 2014, the Court conducted a hearing regarding Defendant's Motion (#26) to Compel Production at which time the Court received testimony from Detective Randy Ogle of the Oregon State Police (OSP) that is also pertinent to the Motion to Suppress.[1]

On March 17, 2014, the Court conducted an additional evidentiary hearing, received documentary evidence, and heard testimony from Detective Adam Michael Dean of the McMinnville Police Department, Sergeant Kaipo Raiser of OSP, Sergeant Christopher Troy Ray of the Yamhill County Sheriff's Office, and Det. Ogle regarding Defendant's Motion to Suppress.  In particular, the Court received into evidence cellular telephone records of calls between the officers, records of tracking information from the GPS mobile tracking device installed on Defendant's vehicle, records indicating when the officers viewed

---

[1] The Motion to Compel is no longer at issue.

the GPS tracking information on the dates in question, and photographic and video evidence.

The Court makes the following Findings of Fact in order to better frame the legal arguments as to the Conclusions of Law that the parties contend the Court should make on the record of Defendant's Motion to Suppress.

**FINDINGS OF FACT**

Having weighed and evaluated all of the evidence, the Court finds the following facts by a preponderance of the evidence:

On August 6, 2012, Det. Ogle applied for and received a warrant from a Yamhill County Circuit Judge authorizing law-enforcement officers to install a GPS mobile tracking device on Defendant's automobile to monitor the movements of the vehicle. The warrant provided: "You are authorized to leave in place, monitor, and use the mobile tracking device anywhere in the State of Oregon for a time period necessary to complete the investigation, not to exceed thirty (30) days from the date of issuance." Def.'s Ex. A.  On August 13, 2012, Det. Ogle installed the GPS monitoring device on Defendant's car.

**A.    Operation of the GPS Mobile Tracking Device**

1.    The GPS mobile tracking device placed on Defendant's car permitted law-enforcement officers, including Det. Dean, Det. Ogle, and Sgt. Ray, to monitor the movements of Defendant's

3 - FINDINGS OF FACT AND ORDER

car, and presumably Defendant. The tracking device automatically creates a record of its location at intervals determined by the officers operating the tracking software and automatically uploads this information to CovertTrack, an internet-based GPS monitoring service.

    2.   CovertTrack permits users like the officers to download a spreadsheet from its database listing the date, time, location, direction, and speed of travel for the GPS tracking device each time the device automatically reported its location to CovertTrack.

    3.   In addition to the downloadable spreadsheet of automatically recorded data, CovertTrack permits users, like the officers in this case, to track the GPS monitoring device in real time by logging into a password-protected CovertTrack website specific to the GPS tracking device. The first screen of the real-time tracking interface does not display any real-time tracking information, but instead displays a map of the United States and provides the operating officers with options for settings to be used in displaying the tracking information. By selecting a button labeled "refresh," the officers can initiate the real-time tracking function, which then indicates the most recent location of the GPS tracking device by displaying a dot on the map. At the officers' discretion, the program can either display the most recent location of the GPS device or the most

4 - FINDINGS OF FACT AND ORDER

recent location with dots and arrows that indicate the device's location and direction of travel over the course of a preset number of prior locations.

    4.    Users of the CovertTrack website, like these officers, can also place a "GeoFence" on various locations that will notify the operating officer by text message and/or email if the GPS tracking device leaves the GeoFence area.  For example, a user could place a GeoFence on a particular point on a road and receive a notification when the GPS tracking device crossed that point.

**B.**    **<u>GPS Tracking of Defendant</u>**

    1.    On the afternoon and evening of August 19, 2012, Sgt. Ray and Det. Ogle followed Defendant's vehicle in an unmarked police car and began tracking the movements of the GPS tracking device in real time using a laptop computer with a wireless internet connection to CovertTrack.  Det. Ogle drove the police car while Sgt. Ray operated the laptop.

    2.    Det. Ogle and Sgt. Ray followed Defendant through Yamhill County to a residence in St. Paul, Oregon, and then from St. Paul to Wilsonville, Oregon, where Defendant made a stop before merging onto Interstate 5 North in the direction of Portland.

    3.    At 8:37 p.m. on August 19, 2012, Defendant merged onto Interstate 84 East in Portland.  The officers followed Defendant

5 - FINDINGS OF FACT AND ORDER

in Oregon as he continued east on I-84 for approximately three hours with stops in Cascade Locks and The Dalles.

    4.    For approximately one hour the officers lost the signal from the GPS tracking device while following Defendant through the Columbia Gorge on I-84.

    5.    In any event, Det. Ogle and Sgt. Ray relocated the signal from the GPS tracking device while still following Defendant on I-84 in Oregon.

    6.    After stopping in The Dalles, Defendant continued on to Biggs Junction, Oregon, which is a junction with US-97 and provides access to the Sam Hill Memorial Bridge over the Columbia River into the State of Washington. At 11:26 p.m. on August 19, 2012, Defendant crossed into the State of Washington via that bridge.

    7.    Det. Ogle and Sgt. Ray followed Defendant across the bridge into Washington for approximately two miles when they noticed Defendant pull to the side of the road. The officers became concerned that Defendant suspected the officers were following him so they drove out of sight, turned around, and returned to Biggs Junction in Oregon.

    8.    Based on their investigation up to that point, Sgt. Ray and Det. Ogle reasonably suspected Defendant was making the trip to Washington to obtain a quantity of methamphetamine.

9.   Although the officers were using the real-time CovertTrack tracking feature to monitor Defendant's movements while following Defendant in Oregon, Sgt. Ray turned off the real-time tracking function when Defendant crossed the Washington border because he was aware the Oregon warrant did not cover tracking in Washington.

10.   Shortly after the officers returned to Oregon, Sgt. Ray placed a GeoFence marker to track Defendant's movement relative to each border crossing between Oregon and Washington that Sgt. Ray could locate on the map, specifically including the Sam Hill Memorial Bridge.

11.   Nevertheless, Sgt. Ray and Det. Ogle were not confident the GeoFence would work because of the problems they previously had in continuously locating the signal from the GPS tracking device while they were tracking Defendant in the Columbia Gorge. Accordingly, Det. Ogle and Sgt. Ray periodically used the CovertTrack real-time tracking function while Defendant was in Washington to check to see where Defendant was so they would know when he returned to Oregon.

12.   While Defendant was in Washington Sgt. Ray calibrated the real-time tracking function to display only the then-current location of the GPS tracking device on the map without revealing any prior locations.

13. Each time Sgt. Ray or Det. Ogle initiated the real-time tracking function while Defendant was in Washington, they observed only the single point representing the GPS tracking device's location at that moment and no prior or subsequent tracking information. Nevertheless, the officers accumulated knowledge of each prior point of Defendant's location as revealed by their periodic use of the real-time tracking function and did not ignore that information as they waited for Defendant's expected return to Oregon.

14. CovertTrack records reflect each time that Det. Ogle or Sgt. Ray initiated the real-time tracking function. As detailed below, CovertTrack records noted twelve instances in which the officers initiated the real-time tracking function while Defendant was in Washington and thereby learned of Defendant's location in Washington at those times.

15. Although Det. Ogle and Sgt. Ray experienced periodic difficulties locating the signal from the GPS tracking device throughout the night and the following morning and afternoon, they did not lose the signal again for any extended period as they had when they were following Defendant on I-84 in Oregon.

16. Sgt. Ray and Det. Ogle did not obtain a warrant for tracking Defendant in the State of Washington, and it is unclear whether the officers actually considered obtaining such a warrant. The Court notes there is not any evidence of any

8 - FINDINGS OF FACT AND ORDER

practical obstacle to obtaining a warrant from a Washington judicial officer to authorize GPS monitoring of Defendant's movements while in Washington.

17. Throughout the late evening of August 19 and early morning of August 20, 2012, Sgt. Ray and Det. Ogle were in contact with Det. Dean, who was working his patrol shift in McMinnville until approximately 1:00 a.m. At some point in the late evening or early morning, the officers agreed Det. Dean would drive to meet them to assist in the ongoing surveillance and investigation, but first Det. Dean would go home to get a few hours of sleep after his shift before driving to meet Sgt. Ray and Det. Ogle in the morning.

18. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 12:41 a.m. on August 20, 2012. At that time the GPS tracking device was on Interstate 82 on the west side of Kennewick, Washington, which is approximately 110 miles from the Sam Hill Memorial Bridge crossing back to Biggs Junction in Oregon.

19. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 1:15 a.m. on August 20, 2012. At that time the GPS tracking device was on Washington State Highway 397 in south Kennewick.

9 - FINDINGS OF FACT AND ORDER

20. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 3:56 a.m. on August 20, 2012. At that time the GPS tracking device was on U.S. Highway 395 in central Kennewick.

21. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 4:02 a.m. on August 20, 2012. At that time the GPS tracking device was on Interstate 182 in Pasco, Washington, which is approximately five miles from Kennewick, Washington.

22. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 4:30 a.m. on August 20, 2012. At that time the GPS tracking device was on Smith Canyon Road near Eltopia, Washington, approximately 25 miles north of Kennewick.

23. At some point in the night Det. Ogle and Sgt. Ray drove to the Boardman Rest Area near Hermiston, Oregon, approximately 55 miles east of Biggs Junction, and remained there for two or three hours to get some rest.

24. Sometime between approximately 6:00 and 7:00 a.m. on August 20, 2012, Det. Dean woke up at his home in the McMinnville area and began driving east to meet Det. Ogle and Sgt. Ray.

25. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 7:54 a.m. on August 20, 2012. At that time the GPS tracking device was on Pepiot Road in Mesa, Washington, approximately 30 miles north of Kennewick.

26. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 8:03 a.m. on August 20, 2012. At that time the GPS

tracking device was on Eltopia West Road in Eltopia, Washington, approximately 20 miles north of Kennewick.

    27.  At approximately 9:00 a.m. on August 20, 2012, Det. Ogle and Sgt. Ray met Sgt. Raiser in his office at the OSP station in The Dalles approximately 18 miles west of Biggs Junction.  Although Sgt. Raiser did not have any previous involvement in the investigation of Defendant, Det. Ogle and Sgt. Ray met with him to request that he prepare to assist them.  Det. Ogle and Sgt. Ray informed Sgt. Raiser that they believed Defendant might be coming through Sgt. Raiser's patrol area that day and they believed Defendant was involved in trafficking narcotics.  Det. Ogle and Sgt. Ray gave Sgt. Raiser a description of Defendant's automobile including his license-plate number and informed Sgt. Raiser that they suspected Defendant would cross back into Oregon at Biggs Junction.  Sgt. Raiser agreed to help Det. Ogle and Sgt. Ray engage Defendant when he crossed back into Oregon.

    28.  Det. Dean met Sgt. Ray and Det. Ogle in the parking lot of the OSP office in The Dalles sometime between 9:00 and 10:00 a.m. on August 20, 2012.

    29.  Sgt. Raiser left the OSP office to go out on patrol at approximately 9:30 a.m on August 20, 2012.

    30.  The officers testified they assumed Defendant would re-enter Oregon via the same route that he used to cross into

11 - FINDINGS OF FACT AND ORDER

Washington.  Thus, before leaving the OSP office in The Dalles, Det. Ogle, Det. Dean, and Sgt. Ray agreed to wait at Biggs Junction to see whether Defendant would cross back into Oregon via the Sam Hill Memorial Bridge.

    31.  Det. Ogle or Sgt. Ray initiated the real-time tracking function at 9:33 a.m. on August 20, 2012.  At that time the GPS tracking device was on South Owens Road on the south side of Kennewick.  As noted, Kennewick is approximately 110 miles from Biggs Junction.

    32.  Det. Ogle, Sgt. Ray, and Det. Dean drove from the OSP office in The Dalles to Biggs Junction where they parked in a gas-station parking lot with a clear view of the Oregon side of the Sam Hill Memorial Bridge.  From their vantage point in the parking lot the officers could also see in the distance a portion of US-97 that approached the Washington side of the bridge.

    33.  In addition to the Sam Hill Memorial Bridge in Biggs Junction, there are a number of possible places to cross the Oregon-Washington border.  From Biggs Junction the nearest routes to cross the Oregon-Washington border are I-82, which crosses the Columbia River near Hermiston, Oregon, and is approximately 85 miles northeast of Biggs Junction; US-730 approximately 100 miles northeast of Biggs Junction; The Dalles Bridge on US-197 approximately 18 miles west of Biggs Junction; the Hood River Bridge approximately 40 miles west of Biggs Junction; the Bridge

12 - FINDINGS OF FACT AND ORDER

of the Gods in Cascade Locks, Oregon, approximately 60 miles west of Biggs Junction; the Glenn L. Jackson Memorial Bridge on Interstate 205 in Portland approximately 100 miles west of Biggs Junction; and the Interstate Bridge on I-5 in Portland approximately 110 miles west of Biggs Junction.  The Washington side of each border crossing west of Biggs Junction is accessible from Washington State Highway 14 (WA-14), which parallels the Columbia River between Vancouver and I-82 south of Kennewick.

34.  Two of these border crossings (the I-82 crossing near Hermiston and the Sam Hill Memorial Bridge crossing at Biggs Junction) are on the most direct route from the Kennewick area to I-84 West on the Oregon side of the Columbia River.  That route runs due south on I-82 from Kennewick to the Columbia River.  The I-82 crossing continues from that point over the river to the area of Hermiston, Oregon, and from there one can access I-84 West.  To access the Sam Hill Memorial Bridge crossing from I-82 at the Columbia River, however, one would take WA-14 on the Washington side of the Columbia River approximately 79 miles west to its junction with US-97, turn south, and then continue approximately two miles to cross over the Sam Hill Memorial Bridge at Biggs Junction where I-84 West is easily accessed.

35.  Det. Ogle called Sgt. Raiser at 9:59 a.m. on August 20, 2012.  The substance of this two-minute telephone call is unknown.  The CovertTrack spreadsheet of all information received

13 - FINDINGS OF FACT AND ORDER

from the GPS tracking device indicates that at approximately the same time Defendant merged from I-82 south of Kennewick onto WA-14 heading west, which eliminated I-82 as a likely border crossing point.[2]  There is not, however, a record of real-time tracking at this time.  The Court, therefore, finds Det. Ogle did not know Defendant made this turn at the time that Det. Ogle called Sgt. Raiser.

36.  Det. Ogle or Sgt. Ray initiated the real-time tracking function at 10:32 a.m. on August 20, 2012.  At that time the GPS tracking device was on Whitcomb Island Road, a road near WA-14 approximately 60 miles east of the Sam Hill Memorial Bridge.

37.  Sgt. Raiser called Det. Ogle at 10:49 a.m. on August 20, 2012.  The substance of this three-minute telephone call is unknown.

38.  Det. Ogle or Sgt. Ray initiated the real-time tracking function at 11:25 a.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 53 miles east of the Sam Hill Memorial Bridge.

39.  Based on the tracking data from 10:32 a.m. and 11:25 a.m., Det. Ogle and Sgt. Ray knew Defendant was probably not going to use the I-82 crossing and was traveling west on WA-14,

---

[2] The government indicates it will not introduce at trial any information on the spreadsheet gathered while Defendant was in Washington.

14 - FINDINGS OF FACT AND ORDER

which increased the likelihood that Defendant would use the Sam Hill Memorial Bridge to cross into Oregon at Biggs Junction.

40.   Det. Ogle called Sgt. Raiser at 11:31 a.m. on August 20, 2012, for two minutes and at 11:34 a.m. for one minute.  Sgt. Raiser called Det. Ogle at 11:35 a.m. for three minutes.  Although the precise substance of these telephone calls is unknown, the Court finds Det. Ogle and Sgt. Raiser probably discussed Defendant's movements toward the Sam Hill Memorial Bridge and the likelihood that Defendant would soon return to Oregon at Biggs Junction.

41.   Det. Ogle or Sgt. Ray initiated the real-time tracking function at 12:04 p.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 25 miles east of the Sam Hill Memorial Bridge.

42.   Det. Ogle or Sgt. Ray initiated the real-time tracking function at 12:14 p.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 10 miles east of the Sam Hill Memorial Bridge.

43.   The periodic tracking that took place while Defendant was moving west on WA-14 continued to reinforce the officers' belief that Defendant would cross back into Oregon via the Sam Hill Memorial Bridge and, moreover, gave the officers an approximate time-frame in which to expect Defendant to arrive at Biggs Junction.

15 - FINDINGS OF FACT AND ORDER

44.  Det. Ogle called Sgt. Raiser at 12:21 p.m. on August 20, 2012, for two minutes.  The exact substance of this telephone call is unknown, but the Court finds its probable purpose was to inform Sgt. Raiser that Defendant was nearing the border crossing at Biggs Junction.  Although the Court notes the CovertTrack spreadsheet of all information received from the GPS tracking device indicates that at approximately the same time Defendant turned from WA-14 onto the US-97 approach to the Sam Hill Memorial Bridge, there is not a record of any real-time tracking and, therefore, the officers could not have known this from their use of the GPS tracking device while Defendant was in Washington.

45.  The Court notes the officers agreed on the plan to wait at Biggs Junction for Defendant to return to Oregon around 9:30 a.m. before the GPS tracking in Washington revealed Defendant's westbound route on WA-14 or any other specific information about when or where Defendant would cross back into Oregon.  The Court finds credible the officers' testimony that they always assumed it most likely that Defendant would cross back into Oregon at the same location that he crossed into Washington the night before.  The officers' tracking of Defendant's movements in Washington, particularly while he was westbound on WA-14 on the return trip to Oregon, certainly reinforced the officers' assumption that Defendant would return

via the Sam Hill Memorial Bridge.  Moreover, the tracking of Defendant's movements westbound on WA-14 provided the officers with an increasingly specific time-frame in which to expect Defendant to cross into Oregon at Biggs Junction, and the officers further relied on this information to coordinate with Sgt. Raiser so he would be available and in place to stop Defendant for a traffic violation if and when Defendant's driving provided a lawful basis to do so.

    46.  Det. Ogle, Sgt. Ray, and Det. Dean were in place and saw a vehicle that matched the description of Defendant's car as it descended the hill on US-97 on the Washington side of the Columbia River toward the Sam Hill Memorial Bridge.  The officers verified it was Defendant's car when they viewed it crossing the bridge.  At some point shortly after the officers viewed Defendant's car, Sgt. Ray received the GeoFence alert notifying him that Defendant had crossed back into Oregon at Biggs Junction.  In fact, at 12:24 p.m. on August 20, 2012, CovertTrack data reflects Defendant crossed the border back into Oregon via the Sam Hill Memorial Bridge.

    47.  Also at 12:24 p.m. on August 20, 2012, Det. Ogle called Sgt. Raiser for two minutes.  The precise substance of this telephone call is unknown, but the Court finds its purpose was to inform Sgt. Raiser that Defendant had crossed into Oregon and was in the vicinity of Biggs Junction.

17 - FINDINGS OF FACT AND ORDER

48. At 12:25 p.m. on August 20, 2012, Defendant pulled into a gas station at the intersection adjacent to where the officers were parked.

49. At 12:25 p.m. on August 20, 2012, Det. Ogle again called Sgt. Raiser for two minutes. The precise substance of this call is also unknown, but the Court finds its purpose was to inform Sgt. Raiser that Defendant had stopped at the gas station.

50. After going through a McDonald's drive-thru, Defendant turned left onto US-97 to merge eventually onto I-84 West. At the intersection of US-97 and the Biggs-Rufus Highway, however, Det. Dean observed Defendant come to a stop at a stop sign in the left-turn lane before signaling a left turn.

51. At 12:37 p.m. on August 20, 2012, Det. Ogle called Sgt. Raiser and informed him that Defendant committed the traffic infraction of failing to signal for 100 feet before making the left turn onto US-97. Det. Ogle requested Sgt. Raiser to pull Defendant over.

52. At 12:39 p.m. on August 20, 2012, Defendant merged onto I-84 West.

53. At approximately 12:45 p.m. on August 20, 2012, Sgt. Raiser pulled Defendant over on I-84 approximately two miles west of Biggs Junction. After Defendant refused to consent to a search of the automobile, Sgt. Raiser deployed his narcotics-detection canine to the exterior of Defendant's vehicle. The

narcotics-detection canine "alerted" to the odor of narcotics, and the officers found approximately one-and-a-half pounds of methamphetamine, one ounce of cocaine, five grams of heroin, and five-and-a-half grams of marijuana during their subsequent search of the vehicle.

## ORDER

As the Court explained at the conclusion of the March 17, 2014, evidentiary hearing, the Court has made these Findings of Fact to frame the parties' legal arguments as to the Conclusions of Law the parties propose the Court should make on this record. Because the government bears the burden of demonstrating the admissibility of the evidence seized from Defendant's vehicle notwithstanding the GPS monitoring that occurred outside of the scope of the warrant, the Court will evaluate the parties' next submissions against that standard.  *See Brown v. Illinois*, 422 U.S. 590, 604 (1975).

Accordingly, Defendant and the government shall submit their respective proposed conclusions of law and any legal argument to support such proposed conclusions **no later than April 21, 2014.**

The parties may submit response memoranda **no later than April 28, 2014**, when the Court will take the Motion to Suppress (#35) under advisement without further argument.

    IT IS SO ORDERED.

    DATED this 7th day of April, 2014.

                                                /s/ Anna J. Brown

                                        _____
                                        ANNA J. BROWN
                                        United States District Judge