IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

UNITED STATES OF AMERICA,                    3:12-cr-00513-BR-1

                    Plaintiff,          FINAL FINDINGS OF FACT

v.                                                          AND

                             CONCLUSIONS OF LAW

MARK ALBERT LYNN,

                    Defendant.


S. AMANDA MARSHALL
United States Attorney
JOHN C. LAING
Assistant United States Attorney
1000 S.W. Third Avenue
Suite 600
Portland, OR 97204
(503) 727-1000

       Attorneys for Plaintiff

STEVEN T. WAX
Federal Public Defender
SUSAN A. RUSSELL
Assistant Federal Public Defender
101 S.W. Main Street
Suite 1700
Portland, OR 97204
(503) 326-2123

       Attorneys for Defendant


1 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

**BROWN, Judge.**

This matter comes before the Court on Defendant's Motion (#35) to Suppress Evidence and Statements in which Defendant seeks to suppress, among other things, evidence seized during a search of his vehicle as part of a traffic stop made during a time that Defendant's vehicular movements were monitored pursuant to a state warrant authorizing GPS monitoring in Oregon. Based on these Final Findings of Fact and Conclusions of Law, the Court **DENIES** Defendant's Motion (#35) to Suppress Evidence and Statements.

## BACKGROUND

On January 24, 2014, the Court conducted a hearing regarding Defendant's Motion (#26) to Compel Production and received testimony from Detective Randy Ogle of the Oregon State Police (OSP) that is also pertinent to the Motion to Suppress.[1]

On March 17, 2014, the Court conducted an additional evidentiary hearing, received documentary evidence, and heard testimony from Detective Adam Michael Dean of the McMinnville Police Department, Sergeant Kaipo Raiser of OSP, Sergeant Christopher Troy Ray of the Yamhill County Sheriff's Office, and Det. Ogle regarding Defendant's Motion to Suppress. In

---

[1] Defendant's Motion (#26) to Compel is no longer at issue.

2 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

particular, the Court received into evidence cellular telephone records of calls between the officers, records of tracking information from the GPS mobile tracking device installed on Defendant's vehicle, records indicating when the officers viewed the GPS tracking information on the dates in question, and photographic and video evidence.

On April 7, 2014, the Court made the following Findings of Fact[2] as a framework for the parties' legal arguments in support of their proposed conclusions of law as to Defendant's Motion to Suppress and as a precursor to the Court's final Findings of Fact and Conclusions of Law.  The parties then simultaneously submitted their proposed conclusions of law and, ultimately, their responses to those proposals.

Having fully considered the parties' proposed conclusions of law and supporting legal arguments in light of the record as a whole, the Court now issues its Final Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

Having weighed and evaluated all of the evidence, the Court finds the following facts by a preponderance of the evidence:

---

[2]  As noted, the Court's Findings of Fact (#43) filed on April 7, 2014, were intended to provide a framework for the parties' submissions of and legal arguments in support of proposed conclusions of law.  The Court's Final Findings of Fact include minor changes in language.

3 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

On August 6, 2012, Det. Ogle applied for and received a
warrant from a Yamhill County Circuit Judge authorizing
law-enforcement officers to install a GPS mobile tracking device
on Defendant's automobile to monitor the movements of the
vehicle.  The warrant provided:  "You are authorized to leave in
place, monitor, and use the mobile tracking device anywhere in
the State of Oregon for a time period necessary to complete the
investigation, not to exceed thirty (30) days from the date of
issuance."  Def.'s Ex. A.  On August 13, 2012, Det. Ogle
installed the GPS monitoring device on Defendant's car.

**A.    Operation of the GPS Mobile Tracking Device**

1.    The GPS mobile tracking device placed on Defendant's
car permitted law-enforcement officers, including Det. Dean,
Det. Ogle, and Sgt. Ray, to monitor the movements of Defendant's
car and presumably Defendant.  The tracking device automatically
creates a record of its location at intervals determined by the
officers operating the tracking software and automatically
uploads this information to CovertTrack, an internet-based GPS
monitoring service.

2.    CovertTrack permits users like the officers to download
a spreadsheet from its database listing the date, time, location,
direction, and speed of travel for the GPS tracking device each
time the device automatically reports its location to
CovertTrack.

4 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

3.    In addition to the downloadable spreadsheet of automatically recorded data, CovertTrack permits users, like the officers in this case, to track the GPS monitoring device in real time by logging into a password-protected CovertTrack website specific to the GPS tracking device.  The first screen of the real-time tracking interface does not display any real-time tracking information, but instead displays a map of the United States and provides the operating officers with options for settings to be used in displaying the tracking information.  By selecting a button labeled "refresh," the officers can initiate the real-time tracking function, which then indicates the most recent location of the GPS tracking device by displaying a dot on the map.  At the officers' discretion, the program can either display the most recent location of the GPS device or the most recent location with dots and arrows that indicate the device's location and direction of travel over the course of a preset number of prior locations.

4.    Users of the CovertTrack website, like these officers, can also place a "GeoFence" on various locations that will notify the operating officer by text message and/or email if the GPS tracking device leaves the GeoFence area.  For example, a user could place a GeoFence on a particular point on a road and receive a notification when the GPS tracking device crossed that point.

5 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

**B.**   **GPS Tracking of Defendant**

1.    On the afternoon and evening of August 19, 2012, Sgt. Ray and Det. Ogle followed Defendant's vehicle in an unmarked police car and began tracking the movements of the GPS tracking device in real time using a laptop computer with a wireless internet connection to CovertTrack.  Det. Ogle drove the police car while Sgt. Ray operated the laptop.

2.    Det. Ogle and Sgt. Ray followed Defendant through Yamhill County to a residence in St. Paul, Oregon, and then from St. Paul to Wilsonville, Oregon, where Defendant made a stop before merging onto Interstate 5 North in the direction of Portland.

3.    At 8:37 p.m. on August 19, 2012, Defendant merged onto Interstate 84 East in Portland.  The officers followed Defendant in Oregon as he continued east on I-84 for approximately three hours with stops in Cascade Locks and The Dalles.

4.    For approximately one hour the officers lost the signal from the GPS tracking device while following Defendant through the Columbia Gorge on I-84.

5.    In any event, Det. Ogle and Sgt. Ray relocated the signal from the GPS tracking device while still following Defendant on I-84 in Oregon.

6.    After stopping in The Dalles, Defendant continued on to Biggs Junction, Oregon, which is a junction with US-97 and

6 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

provides access to the Sam Hill Memorial Bridge over the Columbia River into the State of Washington.  At 11:26 p.m. on August 19, 2012, Defendant crossed into the State of Washington via that bridge.

7.   Det. Ogle and Sgt. Ray followed Defendant across the bridge into Washington for approximately two miles when they noticed Defendant pull to the side of the road.  The officers became concerned that Defendant suspected the officers were following him so they drove out of sight, turned around, and returned to Biggs Junction in Oregon.

8.   Based on their investigation up to that point, including the facts on which the GPS-warrant was based, Sgt. Ray and Det. Ogle suspected the purpose of Defendant's travels that day, ultimately including his crossing into Washington, was to obtain methamphetamine.[3]

9.   Although the officers were using the real-time CovertTrack tracking feature to monitor Defendant's movements while following Defendant in Oregon, Sgt. Ray turned off the real-time tracking function when Defendant crossed the Washington border because he was aware the Oregon warrant did not cover tracking in Washington.

---

[3] The Court concludes as a matter of law that this suspicion was objectively reasonable, and there has been no contrary assertion.

10.   Shortly after the officers returned to Oregon, Sgt. Ray placed a GeoFence marker to track Defendant's movement relative to each border crossing between Oregon and Washington that Sgt. Ray could locate on the map, specifically including the Sam Hill Memorial Bridge.

11.   Nevertheless, Sgt. Ray and Det. Ogle were not confident the GeoFence would work because of the problems they previously had in continuously locating the signal from the GPS tracking device while they were tracking Defendant in the Columbia Gorge. Because of this concern, Det. Ogle and Sgt. Ray periodically used the CovertTrack real-time tracking function while Defendant was in Washington to check to see where Defendant was so they would know when he returned to Oregon.

12.   While Defendant was in Washington, Sgt. Ray calibrated the real-time tracking function to display only the then-current location of the GPS tracking device on the map without revealing any prior locations.

13.   Each time Sgt. Ray or Det. Ogle initiated the real-time tracking function while Defendant was in Washington, they observed only the single point representing the GPS tracking device's location at that moment and no prior or subsequent tracking information.  Nevertheless, the officers accumulated knowledge of each prior point of Defendant's location as revealed by their periodic use of the real-time tracking function and did

8 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

not ignore that information as they waited for Defendant's expected return to Oregon.

14.    CovertTrack records reflect each time Det. Ogle or Sgt. Ray initiated the real-time tracking function.    As detailed below, CovertTrack records noted twelve instances in which the officers initiated the real-time tracking function while Defendant was in Washington and thereby learned of Defendant's location in Washington at those times.

15.    Although Det. Ogle and Sgt. Ray experienced periodic difficulties locating the signal from the GPS tracking device throughout the night and the following morning and afternoon, they did not lose the signal again for any extended period as they had when they were following Defendant on I-84 in Oregon.

16.    Sgt. Ray and Det. Ogle did not obtain a warrant for tracking Defendant in the State of Washington, and it is unclear whether the officers actually considered obtaining such a warrant.    The Court notes there is not any evidence of any practical obstacle to obtaining a warrant from a Washington judicial officer to authorize GPS monitoring of Defendant's movements while in Washington.

17.    Throughout the late evening of August 19 and early morning of August 20, 2012, Sgt. Ray and Det. Ogle were in contact with Det. Dean, who was working his patrol shift in McMinnville until approximately 1:00 a.m.    At some point in the

9 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

late evening or early morning, the officers agreed Det. Dean
would drive to meet them to assist in the ongoing surveillance
and investigation, but first Det. Dean would go home to get a few
hours of sleep after his shift before driving to meet Sgt. Ray
and Det. Ogle in the morning.

18.  Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 12:41 a.m. on August 20, 2012.  At that time the GPS
tracking device was on Interstate 82 on the west side of
Kennewick, Washington, which is approximately 110 miles from the
Sam Hill Memorial Bridge crossing back to Biggs Junction in
Oregon.

19.  Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 1:15 a.m. on August 20, 2012.  At that time the GPS
tracking device was on Washington State Highway 397 in south
Kennewick.

20.  Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 3:56 a.m. on August 20, 2012.  At that time the GPS
tracking device was on U.S. Highway 395 in central Kennewick.

21.  Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 4:02 a.m. on August 20, 2012.  At that time the GPS
tracking device was on Interstate 182 in Pasco, Washington, which
is approximately five miles from Kennewick, Washington.

22.  Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 4:30 a.m. on August 20, 2012.  At that time the GPS

tracking device was on Smith Canyon Road near Eltopia,
Washington, approximately 25 miles north of Kennewick.

23.   At some point during the night Det. Ogle and Sgt. Ray
drove to the Boardman Rest Area near Hermiston, Oregon,
approximately 55 miles east of Biggs Junction and remained there
for two or three hours to get some rest.

24.   Between approximately 6:00 and 7:00 a.m. on August 20,
2012, Det. Dean woke up at his home in the McMinnville area and
began driving east to meet Det. Ogle and Sgt. Ray.

25.   Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 7:54 a.m. on August 20, 2012.  At that time the GPS
tracking device was on Pepiot Road in Mesa, Washington,
approximately 30 miles north of Kennewick.

26.   Det. Ogle or Sgt. Ray initiated the real-time tracking
function at 8:03 a.m. on August 20, 2012.  At that time the GPS
tracking device was on Eltopia West Road in Eltopia, Washington,
approximately 20 miles north of Kennewick.

27.   At approximately 9:00 a.m. on August 20, 2012,
Det. Ogle and Sgt. Ray met Sgt. Raiser in his office at the OSP
station in The Dalles approximately 18 miles west of Biggs
Junction.  Although Sgt. Raiser did not have any previous
involvement in the investigation of Defendant, Det. Ogle and
Sgt. Ray met with him to request that he assist them.  Det. Ogle
and Sgt. Ray informed Sgt. Raiser that they believed Defendant

11 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

might be coming through Sgt. Raiser's patrol area that day, and they believed Defendant was involved in trafficking narcotics. Det. Ogle and Sgt. Ray gave Sgt. Raiser a description of Defendant's automobile and his license-plate number and informed Sgt. Raiser that they suspected Defendant would cross back into Oregon at Biggs Junction. Sgt. Raiser agreed to help Det. Ogle and Sgt. Ray engage Defendant when he crossed back into Oregon.

28. Det. Dean met Sgt. Ray and Det. Ogle in the parking lot of the OSP office in The Dalles between 9:00 and 10:00 a.m. on August 20, 2012.

29. Sgt. Raiser left the OSP office to go on patrol at approximately 9:30 a.m on August 20, 2012.

30. The officers assumed Defendant would re-enter Oregon via the same route that he used to cross into Washington. Thus, before leaving the OSP office in The Dalles, Det. Ogle, Det. Dean, and Sgt. Ray agreed to wait at Biggs Junction to see whether Defendant would cross back into Oregon via the Sam Hill Memorial Bridge.

31. Det. Ogle or Sgt. Ray initiated the real-time tracking function at 9:33 a.m. on August 20, 2012. At that time the GPS tracking device was on South Owens Road on the south side of Kennewick. As noted, Kennewick is approximately 110 miles from Biggs Junction.

32.  Det. Ogle, Sgt. Ray, and Det. Dean drove from the OSP office in The Dalles to Biggs Junction where they parked in a gas-station parking lot with a clear view of the Oregon side of the Sam Hill Memorial Bridge.  From their vantage point in the parking lot the officers could also see in the distance a portion of US-97 that approached the Washington side of the bridge.

33.  In addition to the Sam Hill Memorial Bridge in Biggs Junction, there are a number of possible places to cross the Oregon-Washington border.  From Biggs Junction the nearest routes to cross the Oregon-Washington border are I-82, which crosses the Columbia River near Hermiston, Oregon, and is approximately 85 miles northeast of Biggs Junction; US-730 approximately 100 miles northeast of Biggs Junction; The Dalles Bridge on US-197 approximately 18 miles west of Biggs Junction; the Hood River Bridge approximately 40 miles west of Biggs Junction; the Bridge of the Gods in Cascade Locks, Oregon, approximately 60 miles west of Biggs Junction; the Glenn L. Jackson Memorial Bridge on Interstate 205 in Portland approximately 100 miles west of Biggs Junction; and the Interstate Bridge on I-5 in Portland approximately 110 miles west of Biggs Junction.  The Washington side of each border-crossing west of Biggs Junction is accessible from Washington State Highway 14 (WA-14), which parallels the Columbia River between Vancouver and I-82 south of Kennewick.

34. Two of these border crossings (the I-82 crossing near
Hermiston and the Sam Hill Memorial Bridge crossing at Biggs
Junction) are on the most direct route from the Kennewick area to
I-84 West on the Oregon side of the Columbia River.  That route
runs due south on I-82 from Kennewick to the Columbia River.  The
I-82 crossing continues from that point over the river to the
area of Hermiston, Oregon, and from there one can access I-84
West.  To access the Sam Hill Memorial Bridge crossing from I-82
at the Columbia River, however, one would take WA-14 on the
Washington side of the Columbia River approximately 79 miles west
to its junction with US-97, turn south, and then continue
approximately two miles to cross over the Sam Hill Memorial
Bridge at Biggs Junction where I-84 West is easily accessed.

35. Det. Ogle called Sgt. Raiser at 9:59 a.m. on August 20,
2012.  The substance of this two-minute telephone call is
unknown.  The CovertTrack spreadsheet of all information received
from the GPS tracking device indicates Defendant merged from I-82
south of Kennewick onto WA-14 heading west at approximately the
same time, which eliminated I-82 as a likely border crossing
point.[4]  There is not, however, a record of real-time tracking at
this time.  The Court, therefore, finds Det. Ogle did not know
Defendant made this turn at the time that Det. Ogle called

---

[4] The government indicates it will not introduce at trial
any information on the spreadsheet gathered while Defendant was
in Washington.

14 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Sgt. Raiser.

36.   Det. Ogle or Sgt. Ray initiated the real-time tracking function at 10:32 a.m. on August 20, 2012.  At that time the GPS tracking device was on Whitcomb Island Road, a road near WA-14 approximately 60 miles east of the Sam Hill Memorial Bridge.

37.   Sgt. Raiser called Det. Ogle at 10:49 a.m. on August 20, 2012.  The substance of this three-minute telephone call is unknown.

38.   Det. Ogle or Sgt. Ray initiated the real-time tracking function at 11:25 a.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 53 miles east of the Sam Hill Memorial Bridge.

39.   Based on the tracking data from 10:32 a.m. and 11:25 a.m., Det. Ogle and Sgt. Ray knew Defendant was probably not going to use the I-82 crossing and was traveling west on WA-14, which increased the likelihood that Defendant would use the Sam Hill Memorial Bridge to cross into Oregon at Biggs Junction.

40.   Det. Ogle called Sgt. Raiser at 11:31 a.m. on August 20, 2012, for two minutes and at 11:34 a.m. for one minute.  Sgt. Raiser called Det. Ogle at 11:35 a.m. for three minutes.  Although the precise substance of these telephone calls is unknown, the Court finds Det. Ogle and Sgt. Raiser probably discussed Defendant's movements toward the Sam Hill Memorial

Bridge and the likelihood that Defendant would soon return to Oregon at Biggs Junction.

41.  Det. Ogle or Sgt. Ray initiated the real-time tracking function at 12:04 p.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 25 miles east of the Sam Hill Memorial Bridge.

42.  Det. Ogle or Sgt. Ray initiated the real-time tracking function at 12:14 p.m. on August 20, 2012.  At that time the GPS tracking device was on WA-14 approximately 10 miles east of the Sam Hill Memorial Bridge.

43.  The periodic tracking that took place while Defendant was moving west on WA-14 continued to reinforce the officers' belief that Defendant would cross back into Oregon via the Sam Hill Memorial Bridge and, moreover, gave the officers an approximate time-frame in which to expect Defendant to arrive at Biggs Junction.

44.  Det. Ogle called Sgt. Raiser at 12:21 p.m. on August 20, 2012, for two minutes.  The exact substance of this telephone call is unknown, but the Court finds its probable purpose was to inform Sgt. Raiser that Defendant was nearing the border crossing at Biggs Junction.  Although the Court notes the CovertTrack spreadsheet of all information received from the GPS tracking device indicates that at approximately the same time Defendant turned from WA-14 onto the US-97 approach to the Sam

Hill Memorial Bridge, there is not a record of any real-time
tracking, and, therefore, the officers could not have known this
from their use of the GPS tracking device while Defendant was in
Washington.

45. The Court notes the officers agreed on the plan to
wait at Biggs Junction for Defendant to return to Oregon around
9:30 a.m. before the GPS tracking in Washington revealed
Defendant's westbound route on WA-14 or any other specific
information about when or where Defendant would cross back into
Oregon.  The Court finds credible the officers' testimony that
they always assumed it most likely that Defendant would cross
back into Oregon at the same location that he crossed into
Washington the night before.  The officers' tracking of
Defendant's movements in Washington, particularly while he was
westbound on WA-14 on the return trip to Oregon, certainly
reinforced the officers' assumption that Defendant would return
via the Sam Hill Memorial Bridge.  Moreover, the tracking of
Defendant's movements westbound on WA-14 provided the officers
with an increasingly specific time-frame in which to expect
Defendant to cross into Oregon at Biggs Junction, and the
officers further relied on this information to coordinate with
Sgt. Raiser so he would be available and in place to stop
Defendant for a traffic violation if and when Defendant's driving
provided a lawful basis to do so.

46.  Thus, Det. Ogle, Sgt. Ray, and Det. Dean were in place and saw a vehicle that matched the description of Defendant's car as it descended the hill on US-97 on the Washington side of the Columbia River toward the Sam Hill Memorial Bridge.  The officers verified it was Defendant's car when they viewed it crossing the bridge.  At some point shortly after the officers viewed Defendant's car, Sgt. Ray received the GeoFence alert notifying him that Defendant had crossed back into Oregon at Biggs Junction.  In fact, at 12:24 p.m. on August 20, 2012, CovertTrack data reflects Defendant crossed the border back into Oregon via the Sam Hill Memorial Bridge.

47.  Also at 12:24 p.m. on August 20, 2012, Det. Ogle called Sgt. Raiser for two minutes.  The precise substance of this telephone call is unknown, but the Court finds its purpose was to inform Sgt. Raiser that Defendant had crossed into Oregon and was in the vicinity of Biggs Junction.

48.  At 12:25 p.m. on August 20, 2012, Defendant pulled into a gas station at the intersection adjacent to where the officers were parked.

49.  At 12:25 p.m. on August 20, 2012, Det. Ogle again called Sgt. Raiser for two minutes.  The precise substance of this call is also unknown, but the Court finds its purpose was to inform Sgt. Raiser that Defendant had stopped at the gas station.

50.  After going through a McDonald's drive-thru, Defendant turned left onto US-97 to merge eventually onto I-84 West.  At the intersection of US-97 and the Biggs-Rufus Highway, however, Det. Dean observed Defendant come to a stop at a stop sign in the left-turn lane before signaling a left turn.

51.  At 12:37 p.m. on August 20, 2012, Det. Ogle called Sgt. Raiser and informed him that Defendant committed the traffic infraction of failing to signal for 100 feet before making the left turn onto US-97.  Det. Ogle requested Sgt. Raiser to pull Defendant over.

52.  At 12:39 p.m. on August 20, 2012, Defendant merged onto I-84 West.

53.  At approximately 12:45 p.m. on August 20, 2012, Sgt. Raiser pulled Defendant over on I-84 approximately two miles west of Biggs Junction.  After Defendant refused to consent to a search of the automobile, Sgt. Raiser deployed his narcotics-detection canine to the exterior of Defendant's vehicle.  The narcotics-detection canine "alerted" to the odor of narcotics, and the officers found approximately one-and-a-half pounds of methamphetamine, one ounce of cocaine, five grams of heroin, and five-and-a-half grams of marijuana during their subsequent search of the vehicle.

## **DISCUSSION**

Defendant's Motion to Suppress focuses exclusively on the alleged illegality of the officers' GPS tracking of Defendant in the State of Washington and the suppression of all evidence obtained subsequent to the allegedly illegal GPS monitoring. The Court notes Defendant did not introduce any evidence that undercut the officers' probable cause to believe that Defendant committed a traffic violation or demonstrated the traffic stop, narcotics-detection canine alert, or search of Defendant's automobile were conducted in violation of the Fourth Amendment. As a preliminary matter, therefore, the Court concludes on this record that the traffic stop itself was supported by probable cause to believe that Defendant committed a traffic violation. The Court also concludes the canine sniff did not unnecessarily prolong the duration of the stop, and the officers' subsequent search of Defendant's vehicle was supported by probable cause to believe that the car contained evidence of narcotics trafficking.

Defendant's Motion to Suppress requires the Court to resolve two remaining questions:  (1) Whether the officers' monitoring of Defendant while in the State of Washington violated the Fourth Amendment, and, if so, (2) whether the monitoring while Defendant was in Washington necessitates suppression of the evidence obtained during the traffic stop and subsequent searches of Defendant's home and storage unit.

20 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

**A.**    **Fourth Amendment Violation**

"[T]he Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" *United States v. Jones*, 132 S. Ct. 945, 949 (2012).

The government's only argument in support of the legality of the GPS tracking while Defendant was in Washington is that "[t]he officers did not monitor [D]efendant's movements while he was in Washington; they merely confirmed that he was not in Oregon."[5] Gov't Proposed Conclusions of Law (#45) at 2. Accordingly, the government appears to argue that because the "officers were using their best efforts to comply with the terms of the warrant," the officers, in effect, did not exceed the scope of the warrant nor violate the Fourth Amendment. *Id.* Defendant, on the other hand, argues the GPS monitoring of Defendant in Washington was outside the scope of the warrant and constituted a search within the meaning of the Fourth Amendment each time the officers obtained information from the GPS device while Defendant was in Washington.

On this record the Court finds the government's argument is foreclosed by the Court's factual findings and the holding of *Jones*. The use of the GPS monitoring device while Defendant was

---

[5] The government does not argue the use of the GPS device while Defendant was in Washington was justifiable without a warrant. Accordingly, the Court does not reach this issue.

in the State of Washington plainly exceeded the provisions of the

warrant, which permitted the officers only to "use the mobile

tracking device anywhere in the State of Oregon."  Def.'s Hr'g

Ex. A.  Moreover, the government's assertion that the officers

only used the periodic checks of the GPS tracking data to

determine whether Defendant had returned to Oregon is

inconsistent with the Court's findings.  As noted, the monitoring

of Defendant in the State of Washington reinforced the officers'

assumption that Defendant would cross back into Oregon at Biggs

Junction; provided the officers with an increasingly specific

time-frame in which to expect Defendant to return; and aided Sgt.

Ray, Det. Ogle, and Det. Dean in coordinating with Sgt. Raiser to

stop Defendant if Defendant committed a traffic violation.

Findings of Fact ¶ 45.  Thus, Defendant is correct that each "use

of [the GPS] device to monitor the vehicle's movements" in

Washington "constitutes a 'search.'"  *See Jones*, 132 S. Ct. at

949.[6]

---

[6] To the extent that the mere physical presence of the GPS
tracking device on Defendant's vehicle in the State of Washington
is a "search" under *Jones*, such a search under the circumstances
in this case is reasonable within the meaning of the Fourth
Amendment because the officers properly installed the GPS
tracking device pursuant to a valid warrant, the removal of the
GPS tracking device from Defendant's moving vehicle before it
crossed into the State of Washington would have been impossible,
and the Fourth Amendment does not require law enforcement to take
impossible actions.  Thus, the illegal search at issue in this
case is the *use* of the GPS tracking device while Defendant was in
the State of Washington rather than the mere presence of the
tracking device on Defendant's vehicle.

22 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

Accordingly, the Court concludes the officers' GPS monitoring while Defendant was in Washington violated the Fourth Amendment.

**B.    <u>Exclusionary Remedy</u>**

When a court finds a Fourth Amendment violation has occurred, the government bears the burden to show that the evidence should not be suppressed.  *United States v. Shetler*, 665 F.3d 1150, 1156-57 (9th Cir. 2011).  "The exclusionary rule bars the prosecution from using at trial evidence that has been obtained through a violation of the Fourth Amendment."  *Id.* at 1156.  "The exclusionary rule applies both to direct products of an illegal search . . . and to indirect products of the illegal search . . . if they 'bear a sufficiently close relationship to the underlying illegality.'"  *Id.* at 1157 (quoting *United States v. Ladum*, 141 F.3d 1328, 1336-37 (9th Cir. 1998)).  "'[E]vidence later discovered and found to be derivative of an illegality'" is known as "'fruit of the poisonous tree.'"  *United States v. Pulliam*, 405 F.3d 782, 785 (9th Cir. 2005)(quoting *Segura v. United States*, 468 U.S. 796, 804 (1984)).

When determining whether evidence bears a sufficiently close relationship to the underlying illegality, "'the core inquiry is whether the police would have discovered the evidence if the misconduct had not occurred.'"  *United States v. Ramirez-Sandoval*, 872 F.2d 1392, 1396 (9th Cir. 1989)(quoting *United*

*States v. Namer*, 835 F.2d 1084, 1087 (5th Cir. 1988)).  "Pursuant to this basic principle of causation, 'evidence will not be excluded as 'fruit' unless the illegality is at least the 'but for' cause of the discovery of the evidence.'"  *Pulliam*, 405 F.3d at 786 (quoting *Segura*, 468 U.S. at 815).

Related to the causation analysis, "[t]he 'inevitable discovery' exception . . . allows the introduction of illegally obtained evidence if the government can show by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means."  *Ramirez-Sandoval*, 872 F.2d at 1396.  *See also Nix v. Williams*, 467 U.S. 431 (1984); *United States v. Reilly*, 224 F.3d 986, 994 (9th Cir. 2000).  "The inevitable discovery doctrine applies only when the fact that makes discovery inevitable is born of circumstances other than those brought to light by the illegal search itself."  *Reilly*, 224 F.3d at 995.  *See also Ramirez-Sandoval*, 872 F.2d at 1396.

**1.    The Officers' Presence in Biggs Junction**

Det. Ogle and Det. Dean made the decision to wait for Defendant to return to Oregon at Biggs Junction at around 9:30 a.m. on August 20, 2012.  At that time the GPS tracking device had not provided the officers with any helpful information as to where or when Defendant would return to Oregon.  Although it is unclear whether the officers made this decision before or after the record of tracking at 9:33 a.m., the presence of the

GPS tracking device on a rural road south of Kennewick at that time would not have established a possible route or time of return.  Indeed, the fact that the GPS tracking device indicated Defendant was on a rural road in the greater Kennewick area would have suggested, if anything, that Defendant was *not* on his way back to Oregon because Defendant was not on one of the main highways used to return to Oregon.

Although the illegal GPS tracking through the night also informed Sgt. Ray and Det. Ogle that Defendant was in the greater Kennewick area, this information would not suggest to the officers when Defendant would likely return to Oregon or whether he was likely to do so at Biggs Junction as opposed to several other border crossings accessible from the Kennewick area.  The Court notes the Sam Hill Memorial Bridge is one of the more likely routes between Kennewick and Defendant's likely return route on I-84 West, but the most direct route from Kennewick to I-84 is the I-82 border crossing.  Thus, the Court finds by a preponderance of the evidence and concludes as a matter of law that the officers' decision to wait for Defendant at Biggs Junction was independent of the illegal GPS tracking, and was instead the direct result of the officers' correct assumption that Defendant would return to Oregon via the same route by which he crossed into Washington.

Defendant argues, however, that the illegal GPS tracking while Defendant was on WA-14 caused the officers to stay at Biggs Junction because "[w]ithout knowledge of Mr. Lynn's time and place of return, there is a substantial possibility they would have been stationed elsewhere when Mr. Lynn crossed [into Oregon]." Def.'s Resp. to Gov't Proposed Conclusions of Law (#48) at 9. Although the Court agrees the illegal GPS monitoring while Defendant was on WA-14 actually reinforced the officers' assumption that Defendant would return to Oregon via the Sam Hill Memorial Bridge, there is not any evidence in the record that Det. Dean, Det. Ogle, or Sgt. Ray would have changed their plan to wait at Biggs Junction even if they had not had information from the illegal GPS monitoring while Defendant was on WA-14. In particular, the Court finds the mere passage of approximately three hours between the officers decision to wait at Biggs Junction and Defendant's eventual return would not have caused the officers to change their plan, and, in fact, there is not any evidence of an intervening event during this period that would have caused the officers to abandon their plan.

Accordingly, although the illegal GPS tracking while Defendant was on WA-14 probably bolstered the officers' confidence that Defendant would cross back into Oregon at Biggs Junction, the Court concludes by a preponderance of the evidence that the officers would probably have been in Biggs Junction when

Defendant crossed the Sam Hill Memorial Bridge even if they had
not had the information from the illegal GPS monitoring.

**2.    The Officers' Observation of the Traffic Violation**

In addition to reinforcing the assumption that Defendant
would cross into Oregon at Biggs Junction, Defendant argues the
illegal GPS monitoring while Defendant was on WA-14 gave the
officers an increasingly specific time-frame to watch for
Defendant to cross back into Oregon.  Without that time-frame,
Defendant maintains the officers would not have known "to keep
acute watch on the bridge at that specific time" and, therefore,
may not have located Defendant in time to observe the traffic
violation that provided the basis for the traffic stop.  Def.'s
Resp. to Gov't Proposed Conclusions of Law at 4.

In light of the GeoFence alert, however, Defendant's
argument is not persuasive.  Even if none of the three officers
had been watching at the moment that Defendant crossed the
bridge, the GeoFence notice would have alerted them to
Defendant's presence almost in real time.  Considering the
developed portion of Biggs Junction is only a small cluster of
gas stations, truck stops, and fast-food restaurants gathered
around one intersection, the officers would easily have located
Defendant's vehicle in time to observe the traffic violation more
than ten minutes after Defendant crossed back into Biggs
Junction.

27 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

The Court, therefore, concludes by a preponderance of the evidence that the officers probably would have been in position to observe Defendant's traffic violation even if the officers had not had the information gleaned from the illegal GPS monitoring.

**3.    The Officers' Coordination of the Traffic Stop**

As noted, the illegal GPS monitoring probably gave the officers additional time to coordinate with Sgt. Raiser to ensure that he was in position to effect a traffic stop when requested by the other officers after Defendant merged onto I-84 West, and the calls between Det. Ogle and Sgt. Raiser while Defendant was on WA-14 were for the purpose of keeping Sgt. Raiser apprised of the probable timing of Defendant's return to Oregon.  Findings of Fact ¶¶ 40, 44, 45.  Without the information from the illegal GPS tracking, it follows that the officers would not have been able to inform Sgt. Raiser of Defendant's return until, at the earliest, the officers observed Defendant cross the Sam Hill Memorial Bridge and/or the GeoFence alert occurred.

Nevertheless, because Det. Dean, Det. Ogle, and Sgt. Ray would have been in position to view the traffic violation, the evidence inevitably would have been discovered during a traffic stop performed by Sgt. Raiser or any other police officer with a nearby canine narcotics-detection unit who would have been contacted by the officers in Biggs Junction.  In other words, once the officers in Biggs Junction observed the traffic

violation that provided the basis for a lawful traffic stop, it became implausible that Defendant would reach his destination in Yamhill County (more than two hours away) without a traffic stop and canine sniff that ultimately would have turned up the evidence that Defendant now seeks to suppress.

The Supreme Court's seminal inevitable discovery case, *Nix v. Williams*, 467 U.S. 431 (1984), is helpful in this instance. In *Nix* a search party of approximately 200 volunteers was searching for the body of a murder victim.  *Id.* at 434-36, 448. Officials called off the search when detectives, in violation of the defendant's Sixth Amendment right to counsel, convinced the defendant to show them where he left the victim's body.  *Id.* at 449.  The defendant led detectives to the body, which was found approximately two-and-a-half miles from the last location of the nearest group of searchers in an area that officials planned to designate as part of the search area and in a general type of location that the volunteers had been instructed to search.  *Id.* at 448-49.  On this record the Court found it "clear" that "the body inevitably would have been found" by the search teams.  *Id.* at 449-50.

Similarly, here it is clear that even if Sgt. Raiser could not have performed the traffic stop, the officers in Biggs Junction would have followed Defendant's vehicle themselves until

29 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

they located another police officer with a nearby canine narcotics-detection unit to perform the stop.

Defendant, nonetheless, argues contingencies such as the unavailability of another officer or the possibility of losing track of Defendant due to another GPS tracking-device malfunction could have prevented such a traffic stop from taking place. Just as the possibility that the search in *Nix* could have conceivably been foiled by mistake or approaching bad weather, however, remote contingencies such as those suggested by Defendant do not negate the government's showing "by a preponderance of the evidence that the tainted evidence would inevitably have been discovered through lawful means." *Ramirez-Sandoval*, 872 F.2d at 1396.

On this record the Court concludes the officers' earlier and untainted decision to wait in Biggs Junction for Defendant's expected return to Oregon, together with the real-time GeoFence alert confirming that return at Biggs Junction combine to make it more probable than not that the officers would have been able to effectuate a similar and perhaps identical traffic stop with a narcotics-detection canine without the information gleaned from the illegal GPS monitoring device.

In summary, the Court concludes the evidence produced in the searches subsequent to the traffic stop and narcotics-detection canine alert inevitably would have been discovered through lawful

30 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW

means because the officers would have been in a position to view the traffic infraction that formed the basis for the traffic stop without the information gleaned from the illegal GPS monitoring device and a subsequent traffic stop would have yielded the evidence that Defendant now seeks to suppress.  The inevitable discovery exception, therefore, applies, and the evidence seized as a result of the traffic stop should not be suppressed.[7]

## CONCLUSIONS OF LAW

For these reasons, the Court reaches the following Conclusions of Law:

1.    Sgt. Ray and Det. Ogle's GPS monitoring of Defendant in the State of Washington was outside of the scope of the search warrant in violation of Defendant's Fourth Amendment rights.

2.    Based on the officers' early, untainted decision to wait in Biggs Junction for Defendant's expected return to Oregon and the untainted, real-time GeoFence alert confirming

---

[7] Because the Court concludes the inevitable discovery exception applies, the Court need not address the parties' arguments concerning "but for" causation and attenuation of the taint.  The Court, however, disagrees with Defendant's characterization of the officers' actions as "flagrant" and "purposeful."  The officers in this case faced a difficult situation to manage without risking their investigation.  While the Court concludes the officers' actions in accessing the GPS data while Defendant was in Washington violated Defendant's Fourth Amendment rights, they did not do so in any purposeful or flagrant manner.

Defendant's return at Biggs Junction, the government has proven by a preponderance of the evidence that without the information gleaned from the illegal GPS tracking, Sgt. Ray, Det. Ogle, and Det. Dean would have, nonetheless, been in position at Biggs Junction to view Defendant's traffic violation, and an ensuing traffic stop would have produced the evidence that Defendant seeks to suppress.

3.    The Court, therefore, concludes the government has carried its burden of proving by a preponderance of the evidence that the inevitable discovery exception applies under these circumstances because the evidence gleaned at the traffic stop inevitably would have been discovered through lawful means.


<u>**CONCLUSION**</u>

Accordingly, the Court **DENIES** Defendant's Motion (#35) to Suppress Evidence and Statements.

The Court notes this matter is set for trial on May 19, 2014, but the Court assumes the parties will not be ready for trial on that date because of the pendency of this Motion to Suppress.

Accordingly, unless a party seeks and receives a continuance, the Court intends to use the current trial setting (9:00 a.m. on May 19, 2014) as a Scheduling Conference at which Defendant appears personally for the purpose of setting new case-management dates and a new trial date.

IT IS SO ORDERED.

DATED this 12th day of May, 2014.


/s/ Anna J. Brown

_____
ANNA J. BROWN
United States District Judge

33 - FINAL FINDINGS OF FACT AND CONCLUSIONS OF LAW